**Louis GOLDSTEIN, Petitioner,**

**v.**

**DELAWARE BUREAU OF ADULT COR-RECTIONS and Superintendent, Plum-mer Work Release, Respondents.**

**No. 95–232–RRM.**

United States District Court,
D. Delaware.

June 26, 1996.

Philip B. Bartoshesky, Biggs & Battaglia, Wilmington, Delaware, Thomas Colas Carroll, Carroll & Cedrone, Philadelphia, Pennsylvania, for petitioner.

Donald L. Gougé, Jr., Heiman Aber & Goldlust, Wilmington, Delaware, Loren C. Meyers, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware, for respondents.

McKELVIE, District Judge.

This is a petition for a writ of habeas corpus. On March 16, 1992, petitioner Louis Goldstein pled guilty to two misdemeanor charges of violating the City of Wilmington Health and Sanitation Code. On that same date, Delaware Superior Court Judge Susan C. Del Pesco sentenced Goldstein to 6 months incarceration, suspended for 6 months probation on each count. On December 6, 1994, Judge Del Pesco found that Goldstein had violated the conditions of his probation and consequently revoked his probation. In his petition, Goldstein alleges that Judge Del Pesco's revocation of his probation violated his right to due process. This is the court's decision on Goldstein's petition.

## I. FACTUAL BACKGROUND

Respondents have filed an answer to Goldstein's petition for a writ of habeas corpus. Goldstein has also filed a reply to respondents' answer. The court draws the following facts from petitioner's complaint and reply, respondents' answer, and the record of the state court proceedings that the parties have filed.

### A. Goldstein's Original Conviction and Sentence

In March of 1989, Goldstein was convicted in Wilmington Municipal Court of nine violations of the City of Wilmington Health and Sanitation Code (the "City Code") based on the condition of certain unrenovated properties that Goldstein owned in Wilmington. Five of those properties are relevant to the present case: 1) 719 Church Street ("**719 Church**"); 2) 1300 West Street ("**1300 West**"); 3) 1401 West Sixth Street ("**1401 W. 6th**"); 4) 707 Washington Street ("**707 Washington**"); and 5) 2701 Washington Street ("**2701 Washington**").

Goldstein appealed his convictions to the Delaware Superior Court. On March 16, 1992, during the pendency of that appeal, Goldstein pled guilty in the Superior Court to two misdemeanor charges of violating the City Code. On the same date, Goldstein entered into a written agreement (the "Agreement") with the City of Wilmington (the "City") to resolve the criminal charges pending against him. Also on that same date, Judge Del Pesco sentenced Goldstein to 6 months incarceration, suspended for 6 months probation, on each count. Judge Del Pesco made adherence to any agreements with the City a special condition of Goldstein's probation.

In its Preamble, the Agreement states that it applies to Goldstein, his immediate family (i.e. his wife and children), and any corporations in which he or his immediate family (collectively "the Goldsteins") own a 50% or greater interest. Paragraph 1 of the Agreement states that "[b]y May 18, 1992, all 'vacant properties' owned or controlled by the Goldsteins will be sold, demolished, or rehabilitated." Paragraph 2 defines "vacant properties" and recites that the Goldsteins and the City had previously agreed to a list of all such properties. This list of vacant properties included **1300 West, 1401 W. 6th**, and **707 Washington**. At the time the parties entered into the Agreement, they could not resolve whether **719 Church** or **2701 Washington** were vacant properties subject to the Agreement.

Paragraph 4 establishes Goldstein's duties with respect to the vacant properties that he does not sell, renovate, or demolish in a timely manner:

4. By May 18, 1992[,] Goldstein will transfer any and all of the Goldsteins' equitable interests in the ownership of "vacant properties" to a Receiver. During the term of the Receivership, any interest Goldstein has or obtains in any residential property which has been or becomes unoccupied and not rehabilitated for one hundred twenty (120) days shall be assigned to [the] Receiver. Goldstein will on May 18, 1992[,] transfer to [the] Receiver all equitable interest[s] in mortgages [on] these "vacant properties".

Paragraph 5 gives Goldstein the right to select the Receiver to whom Paragraph 4 refers from three candidates chosen by Judge Del Pesco. Paragraph 7 states that the Receiver shall receive compensation for his duties and for costs incurred pursuant to those duties. Goldstein shall deposit $5,000 in a bank account for compensation. Paragraph 9 establishes specific duties regarding **1300 West**:

9. With respect to the property at **1300 West Street**, Goldstein shall by May 4, 1992[,] apply to the Zoning Board of Adjustment to request permission to renovate the property for multifamily use. Within one hundred twenty (120) days of the date of the Board's final decision[,] Goldstein shall rehabilitate, sell or demolish the property. (emphasis added)

Finally, Paragraph 14 provides that "[a]ny amendments or alterations to this Agreement must be in writing and signed by both parties. The parties shall agree to reasonable amendments or alterations requested by [the] Receiver." The remaining paragraphs of the Agreement are irrelevant to the present case.

At the time Goldstein and the City entered into the Agreement, Goldstein's son Steven retained an interest in some of the vacant properties. To facilitate Goldstein's compliance with the terms of the Agreement, Steven executed an "irrevocable durable power of attorney" in favor of Goldstein. This document gives Goldstein the power to transfer Steven's interest in any vacant property, or

any financing resulting from the sale of such property, to the Receiver pursuant to the terms of the Agreement.

### B. *Goldstein's Failure To Comply With the Conditions of His Probation*

On May 20, 1992, the City sent a letter to Judge Del Pesco stating that Goldstein had not sold, rehabilitated, or demolished many of the properties designated by the Agreement, including **1300 West, 1401 W. 6th,** and **707 Washington.** Counsel argued that these properties should be turned over to the Receiver pursuant to the Agreement. In addition, counsel requested Judge Del Pesco to rule whether or not **719 Church** and **2701 Washington** fell within the terms of the Agreement.

On May 26, 1992, Goldstein sent a letter to Judge Del Pesco in response to the City's May 20, 1992 letter. As to **1300 West,** he stated that he had filed an application with the Zoning Board of Adjustment on May 4, 1992, in accordance with the Agreement. He also stated that at an April 4, 1992 office conference, the court had granted him a three-week extension to rehabilitate or sell **1401 W. 6th** and **707 Washington.** Goldstein argued that the Agreement did not cover **2701 Washington** and that even if it did, this property had only "minor deficiencies" as of May 26, 1992. Finally, he argued that **719 Church** was and had been occupied and thus should not be on the list of properties designated by the Agreement. Apparently, Judge Del Pesco decided during a meeting with the parties that the Agreement did cover **719 Church** and **2701 Washington.**

On June 6, 1992, Judge Del Pesco held a hearing concerning the possible sale of **719 Church.** At the hearing, Judge Del Pesco stated that Goldstein could sell the property subject to one caveat: "However, I don't want any purchase money mortgages. When I see a purchase mortgage with a three hundred dollar down payment and the balance a purchase money mortgage, that does not make me a very happy person. That is a sham."

On June 12, 1992, the City sent another letter to Judge Del Pesco. This letter observed that Goldstein's three-week extension

to renovate or sell **1401 W. 6th** and **707 Washington** had expired without any action by Goldstein. The City requested Judge Del Pesco to schedule a status conference. On June 26, 1992, Judge Del Pesco held a status hearing on the issues raised by the City. During the status hearing, Goldstein apparently represented that an individual named Michael Kazer had negotiated a contract to purchase **1401 W. 6th.** Later that day, Goldstein sent a letter to Judge Del Pesco confirming this representation. He attached contracts for the sale of properties from Kazer to himself in exchange for **1401 W. 6th** and other properties.

On July 6, 1992, Judge Del Pesco issued an order stating her holdings from the June 26, 1992 status conference. Specifically, the July 6, 1992 order states, in relevant part:

2. Louis Goldstein, his family and agents are barred from taking any further action with regard to **1401 West 6th Street**....

3. Louis Goldstein, his family and agents are barred from taking any further action with regard to **707 Washington Street.** No additional contract, written or oral, or any modifications to the contract presented to the Court which is sold pursuant to the purchase money mortgage [currently held by the Goldsteins on the property], is permitted.

. . . .

5. The application for a variance of the property located at **1300 West Street** is scheduled for a hearing before the City Zoning Board of Adjustment on July 8, 1992.

6. Louis Goldstein has until Tuesday, July 7, 1992 to clean ... **2701 Washington Street** and **719 Church Street.** [Goldstein] has until Monday, July 27, 1992, at 5:00 p.m. to secure a purchaser for **719 Church Street** and to present a signed sales contract without a purchase money mortgage....

7. If [Goldstein] properly maintains the property at **2701 Washington Street,** he may sell the property ... so long as the sale is executed by September 15, 1992. (emphasis added)

*State v. Goldstein,* Cr.A.Nos. N89–04–0710A, 0712A (Del.Super.Ct. July 6, 1992).

On July 29, 1992, the City once again wrote to Judge Del Pesco expressing concern about Goldstein's compliance with his probation. In particular, the City stated that Steven Goldstein had rescheduled the application for a zoning variance at **1300 West** until September of 1992. The City emphasized that Steven had done this on June 19, 1992, before the June 26, 1992 hearing before the Judge, and yet had not informed either the City or the Judge. The City requested that Judge Del Pesco hold a violation of probation hearing.

On August 28, 1992, Goldstein sent a letter to the City stating that **719 Church** was "on track for the settlement date as set forth in the sales contract [with Kazer]." The letter also states that "[t]he Goldsteins will supply no financing and hold no paper on the property after the sale."

On October 23, 1992, Judge Del Pesco issued an order altering her July 6, 1992 order. Specifically, the order states:

1. That paragraph two of the [July 6, 1992 order, which barred action on **1401 W. 6th**,] is void; and

2. That the sale of the propert[y] at **1401 W. 6th Street** ... to Mr. Kaz[e]r be permitted; and

. . . .

4. That Louis Goldstein, his family and agents may retain no legal or equitable interest, including any mortgage, lien, or other security interest in the propert[y] at **1401 W. 6th Street** ....

*State v. Goldstein,* Cr.A.Nos. N89–04–0710A, 0712A (Del.Super.Ct. Oct. 23, 1992).

### C. *Goldstein's October 30, 1992 Violation of Probation Hearing*

On October 30, 1992, Judge Del Pesco held a violation of probation hearing with respect to Goldstein's failure to comply with the conditions of his probation. The parties submitted a stipulation that many of the vacant properties under the Agreement remained in continuing violation of the City Code. During the hearing, counsel for Goldstein made the following statement with respect to **719 Church:**

> Your Honor entered an Order that the contract for sale be submitted or be executed by I think the middle or towards the end of July. A contract was done and [the City's attorney] approved it. And there was financing, independent financing, and settlement was actually supposed to have taken place yesterday.

As a result of the hearing, Judge Del Pesco found Goldstein in violation of the conditions of his probation. Judge Del Pesco reimposed Goldstein's original sentence of incarceration and suspended that sentence for probation for a period of one year. In addition, she made adherence to all agreements with the City a special condition of his probation. To that end, Judge Del Pesco gave Goldstein 30 days to take action on the properties that remained in violation of the City Code.

### D. *Goldstein's Activities After the October 30, 1992 Hearing*

On November 30, 1992, Goldstein sent a letter to the City confirming that settlements had taken place transferring **719 Church** and **1300 West.** Selma Goldstein had owned **1300 West.** She transferred the property to Center Five Corporation ("Center Five"), of which she was the primary agent. She then sold 60% of the stock of Center Five to Kazer for $21,180. She transferred the remainder of the stock to her son Steven. The Goldsteins sold **719 Church** to Nelson Brockenborough by means of a purchase money mortgage. The Goldsteins then assigned the mortgage to Alexander Southwest, Inc. ("Alexander"). Carol Kaufman, an incorporator and member of the Board of Directors of Alexander, is Steven's cousin.

In his November 30, 1992 letter, Goldstein also enclosed a settlement sheet for **1401 W. 6th** because that property was subject to an upcoming Sheriff's sale. With respect to the Sheriff's sale, Goldstein represented that neither he nor any members of his family intended to bid on any properties located in Wilmington, although he expressed his opinion that the Agreement did not bar his family members from doing so.

On December 4, 1992, the City wrote to Judge Del Pesco regarding, in its view, Goldstein's continuing failure to comply with the conditions of his probation. The City acknowledged that it had received notice on November 30, 1992, of the settlement of **719 Church**. Apparently, the property was settled on November 11, 1992, within the thirty-day deadline established by the October 30, 1992 violation of probation hearing. However, the City stated that **1401 W. 6th** had not settled as of that deadline. The City stated that it had received a settlement sheet for **1401 W. 6th**, but that the only date on that document was December 15, 1992, which apparently concerned the payment of certain taxes. In addition, the City stated that the buyer appeared to be Jose Valentin, not Michael Kazer as Judge Del Pesco had required in her October 23, 1992 order. Finally, the City observed that the lender appeared to be Southwest Ventures, Inc. ("Southwest"). Southwest was a mortgage lender founded by Frank O'Donnell, Esquire, Steven Goldstein's lawyer, apparently at Steven's request.

As to **1300 West**, the City expressed serious doubts about the validity of the sale from Center Five to Kazer. The City argued that the entire transaction with Kazer might be a sham because the Goldsteins postponed the zoning hearing and then transferred only 60% of the shares in the property. The City suggested turning the property over to the Receiver. Alternatively, that City requested that Judge Del Pesco set specific deadlines for the zoning hearing and compliance with the zoning board's ultimate decision.

On December 9, 1992, Goldstein sent a letter to Judge Del Pesco in response to the City's December 4, 1992 letter. Goldstein stated that both **719 Church** and **1401 W. 6th** had gone into settlement as of November 30, 1992, within the 30–day deadline. Goldstein asserted that O'Donnell performed the settlement of **1401 W. 6th** and filed a petition for issuance of a deed from the Sheriff's office on behalf of the purchaser, Jose Valentin. Goldstein explained that Kazer had assigned his right to purchase the property to Valentin in order to avoid two transfers of the property. As to **1300 West**, Goldstein stated that the property was transferred to Center Five on September 27, 1992. He stated that he then transferred 60% of Center Five's stock to Kazer on October 3, 1992, and that the deed was recorded on December 7, 1992.

On January 11, 1993, Goldstein selected Gerald Dixon, Esquire, from three individuals designated by Judge Del Pesco to act as the Receiver under the Agreement.

On January 29, 1993, the Mid–Town Brandywine Neighbors Association (the "Neighbors Association") issued a letter stating that it would not support Goldstein's application to the zoning board to alter the zoning requirements applicable to **1300 West**. Apparently, a recommendation from the Neighbors Association would have been necessary in order to result in a successful application with the zoning board.

On February 1, 1993, Goldstein sent a letter to Judge Del Pesco regarding **707 Washington**. He stated that Timothy Amin had made an offer to purchase this property. Goldstein requested Judge Del Pesco to modify her July 6, 1992 order barring the Goldsteins from taking any action with respect to the property. He represented that the Goldsteins would not be taking any purchase money mortgage to finance the purchase of the property by Amin. On February 3, 1993, Judge Del Pesco sent a letter to Goldstein stating that she was placing **707 Washington** in the hands of the Receiver, Dixon, to oversee the sale of the property. She declined to amend her July 6, 1992 order to allow a sale to Amin.

On February 19, 1993, Goldstein wrote a letter to Judge Del Pesco with respect to **1300 West**. Goldstein represented that Kazer was going to buy Steven's remaining 40% share in the property because of the failure to receive of positive recommendation from the Neighbors Association. Goldstein argued that his actions with respect to **1300 West** complied with the Agreement. He asserted that he delivered an application to the zoning board on or near May 4, 1992. He further argued that the sale of 60% of the Center Five stock made Steven's request to delay the zoning board hearing irrelevant because the sale occurred within 120 days of the earliest date on which the zoning board might have made a decision. Finally, he

argued that nothing in the Agreement required him to receive the approval of the City or Judge Del Pesco before selling the property.

On February 22, 1993, the City sent a letter to Judge Del Pesco in response to Goldstein's February 19, 1992 letter. The City observed that the July 6, 1992 order confirmed that the zoning board hearing originally was scheduled on July 8, 1992. Moreover, the City observed that Steven had rescheduled the hearing prior to the issuance of the July 6, 1992 order without informing the City or Judge Del Pesco. The City argued that Goldstein's sale of **1300 West** did not absolve him of his requirement under the July 6, 1992 order to attend the July 8, 1992 zoning board hearing. Thus, the City argued that Judge Del Pesco could transfer Goldstein's 40% interest in the property to the Receiver. In addition, the City argued that neither the City nor the Judge approved of the sale to Kazer, thus the Judge also could transfer the remaining 60% interest in the property.

On March 30, 1993, Goldstein wrote a letter to Judge Del Pesco stating that Steven had completed the sale of his 40% share in **1300 West** to Kazer, thus making that property no longer subject to the Agreement. However, Dixon later learned that Selma Goldstein recorded a mortgage for $52,000 on **1300 West** to Steven Goldstein 6 minutes prior to recording the deed to Center Five. Thus, Steven retained a mortgage on **1300 West** when Kazer purchased 60% of Center Five's stock. Goldstein's March 30, 1992 letter did not reveal the existence of this mortgage.

On May 6, 1993, Goldstein forwarded to Dixon a copy of a stipulation between Goldstein and the City allowing Goldstein's corporation, Kirklynn Corporation ("Kirklynn"), to transfer **707 Washington** to Dixon. Goldstein alleges that he followed the advice of counsel that Judge Del Pesco approved the stipulation at some unspecified unrecorded conference. On May 7, 1993, Kirklynn apparently executed the deed to this property in favor of Dixon pursuant to the stipulation. However, on June 4, 1993, Kirklynn executed a deed to **707 Washington** to Amin. To finance the sale of the property, Kirklynn took back a purchase money mortgage. On that same day, Kirklynn assigned the mortgage for $1 to Alexander. On July 26, 1993, Dixon informed Judge Del Pesco that Kirklynn had sold **707 Washington** to Amin. It is not clear whether Dixon wrote a letter to the Judge or reported his findings orally.

Judge Del Pesco also discovered that Selma Goldstein had sold **2701 Washington** to Denzil Lamont on October 7, 1993, without notice or leave under the July 6, 1992 order requiring the Goldsteins to take no action on this property after September 15, 1992. Selma Goldstein forced this property into foreclosure by alleging that the owner, Mary Tingle, owed her over $66,000. At the Sheriff's sale, Twenty–Seven Washington Street Corp. ("Twenty–Seven Corp."), a Goldstein corporation, successfully bid $36,500 for the property. Twenty–Seven Corp. subsequently assigned the property to Lamont and took back a purchase money mortgage for $74,500. Selma gratuitously released her claim against Tingle for $32,850.

On October 23, 1993, Judge Del Pesco signed a report sent by Goldstein's probation officer setting out the nature and circumstances of Goldstein's violations of his probation. In particular, the report stated that Goldstein had not adhered to his agreement with the City to review and respond to certain violation notices, which Judge Del Pesco had ordered at a July 15, 1993 hearing. On November 9, 1993, Judge Del Pesco held a status conference at which the parties apparently conceded that Goldstein was in violation of his probation. Judge Del Pesco ordered Goldstein to submit a specific plan for the resolution of these violations by November 19, 1993. On that date, Goldstein provided a property status report to the Judge. On December 28, 1993, Judge Del Pesco issued an order compelling Goldstein to complete all of the necessary repairs by January, 15, 1994, the date suggested by Goldstein, and scheduling a violation of probation hearing for January 24, 1994, which the Judge later postponed.

On or about January 18, 1994, **1401 W. 6th** actually went to settlement. Selma Goldstein gave a purchase money mortgage to the

purchaser and subsequently assigned the mortgage to Southwest Ventures, Inc., O'Donnell's corporation, for $1.

On January 24, 1994, the City wrote a letter to Judge Del Pesco explaining the status of various properties and Goldstein's compliance with the terms of his probation. In particular, the City stated that Goldstein had sold **2701 Washington,** that a building permit had been obtained, and that work was "in progress." The letter did not refer to any other properties relevant to this case. On February 24, 1994, the City wrote another letter regarding **719 Church.** The City stated that when the Goldsteins sold this property to Brockenborough, the settlement included a purchase money mortgage in contravention of the July 6, 1992 order and Goldstein's previous representations. The lender on the settlement sheet was Southwest Ventures, Inc. which subsequently assigned the mortgage to Alexander Southwest, Inc., Carol Kaufman's corporation.

At a March 2, 1994 teleconference, Judge Del Pesco and counsel for both parties agreed that Dixon should investigate the City's allegations with respect to **719 Church.** Dixon issued a report on July 13, 1994 (the "First Report"), detailing a number of discrepancies. He found that the lender was not Southwest Ventures, Inc, but 719 Corporation ("719 Corp."), a Goldstein corporation. Dixon also found that the purchaser, Brockenborough, was a college student with no income and had executed a purchase money mortgage in favor of 719 Corp. for more than the purchase price in order to cover his settlement costs. Finally, Dixon reasoned that 719 Corp. could not have assigned the mortgage to Alexander on November 11, 1992, as Goldstein argued. First, the assignment allegedly occurred nearly two months before Alexander was incorporated on January 3, 1993. Second, the assignment contained information concerning the recording of the mortgage that Goldstein could not have known until several days later. Therefore, Dixon concluded that 719 Corp. must have held the purchase money mortgage on **719 Church** for two to four months after the sale on November 11, 1992.

In his First Report, Dixon noted a number of other inconsistencies. First, he found that Steven Goldstein had initiated an action against Brockenborough for the downpayment and settlement costs associated with **719 Church.** In addition, he discovered that Brockenborough had never made a single mortgage payment and that Goldstein, acting as Alexander's attorney, had filed a debt action against Brockenborough to recover for nonpayment on the mortgage. Dixon concluded that even if the Goldsteins' actions with respect to **719 Church** did not violate the express language of Judge Del Pesco's July 6, 1992 order, those actions certainly violated the intent of the order. Dixon attached a number of documents in support of his findings, including the mortgage, the assignment, and the actions filed by the Goldsteins.

On July 28, 1994, Judge Del Pesco issued two short orders. The first order required George Brancati, Esquire, an attorney involved in the sale of **2701 Washington,** to turn over any documents to Dixon related to the financing and transfer of that property. The second order similarly required Stanley Lowicki, Esquire, an attorney involved in the sale of **707 Washington,** to turn over any documents related to the transfer of that property. Apparently, these two orders were the first indication to Goldstein that Dixon was investigating matters beyond the transfer of **719 Church.** It appears that Dixon began these investigations after a teleconference with the City and Judge Del Pesco.

On August 17, 1994, Dixon submitted a second report (the "Second Report") concerning his subsequent investigations of Goldstein's activities. Apparently, Dixon randomly selected **2701 Washington, 707 Washington, 1401 W. 6th, 1300 West,** and two other properties unrelated to this case. With respect to **1300 West,** Dixon reported the $52,000 mortgage on the property executed in favor of Steven Goldstein from Selma Goldstein immediately before her transfer of the 60% share of stock to Michael Kazer. Dixon argued that Steven's retention of the remaining 40% of the stock and the mortgage gave him "more than a 50% controlling inter-

est in this property." With respect to **707 Washington**, Dixon could find no direct violation of Goldstein's probation, although he questioned the assignment of the mortgage on the property to Alexander Southwest, Inc. for merely $1. Dixon observed that Goldstein would be violating his probation regarding these transactions only if he controlled Alexander.

With respect to **2701 Washington**, Dixon related Selma Goldstein's purchase money mortgage remaining from the sale of this property to Denzil Lamont. Dixon expressed his belief that the Goldstein was not supposed to retain such an interest in any properties. With respect to **1401 W. 6th**, Dixon discovered that the Goldsteins' transactions resembled those related to the transfer of **719 Church**. Dixon found that the actual purchase money mortgage lender was Selma Goldstein, not Southwest Ventures, Inc. as the settlement sheet reflected. Moreover, he found that Selma subsequently assigned this mortgage to Alexander for $1. Dixon concluded as a result of his findings that Goldstein was "in gross violation of the agreement entered into with the City of Wilmington, as well as [Judge Del Pesco's] various Orders."

On August 24, 1994, Judge Del Pesco scheduled a violation of probation hearing for September 9, 1994, based on Dixon's First and Second Reports. She had scheduled violation hearings on earlier dates, but she had rescheduled each due to various reasons, such as illnesses and vacations. On September 8, 1994, Steven Goldstein satisfied his mortgage on **1300 West**. On September 9, 1994, Judge Del Pesco held the violation hearing at which the parties stated that they had reached a settlement of the outstanding issues. She told the parties to work out the details of the agreement, subject to her approval.

On September 19, 1994, Goldstein sent to the Judge a copy of the draft Consent Order between himself and the City. On September 20, 1994, the Judge sent a message by facsimile to the parties indicating that another scheduled revocation hearing would occur unless Goldstein agreed to certain new conditions not in the draft Consent Order. In particular, the facsimile stated:

> a. Neither Goldstein nor any family member is to list any property with any agent.
>
> . . . .
>
> c. Deeds for 2225 Lamotte Street; 919 Spruce Street; 111 Ruth Street and 703 Washington Street are to be executed in blank and delivered to the Receiver by 5 p.m. on September 21.

The facsimile required Goldstein to respond by 9 a.m. on September 21, 1994.

On September 21, 1994, Goldstein sent a letter to Judge Del Pesco in response to her facsimile stating:

> The conditions imposed in your faxed message of September 20, 1994 are accepted by Louis Goldstein.
>
> The Agreement with the City gives Mr. Goldstein the right to sell 703 Washington Street and 111 Ruth Street. That provision is the linchpin of the Agreement.
>
> We do not understand the Court's restriction to prohibit using a real estate agent to accomplish the sales in the time specified by the Agreement.
>
> If we are incorrect, we request the Court's instruction on this matter.

This letter was carbon copied to Dixon and the City.

On that same day, Dixon sent a marked-up copy of this letter (the "marked-up letter") by facsimile to Judge Del Pesco. This marked-up letter was critical of counsel for Goldstein, Victor Battaglia, stating that the "agreement has *NOT* been accepted. Victor is *again* providing you with half-truths while *continuing* to obstruct these proceedings." Goldstein apparently did not discover the marked-up letter until sometime after December 6, 1994.

Also on that same day, Judge Del Pesco indicated to the parties that she interpreted Goldstein's September 20, 1994 letter as a rejection and that the September 22 revocation hearing would go forward unless Goldstein immediately transferred the properties in question to Dixon. Goldstein asked if such a transfer would end the period of probation. Judge Del Pesco indicated that there would be additional terms and that Dixon was

working on a new agreement. Goldstein expressed his belief that such additional terms would be unlawful.

### E. *Goldstein's September and October Revocation Hearings and Judge Del Pesco's December 6, 1994 Opinion Revoking Goldstein's Probation*

On September 22 and 23, 1994, Judge Del Pesco held another revocation of probation hearing regarding Goldstein's compliance with the conditions of his probation. The hearing continued on October 6, 1994. The City introduced as exhibits Dixon's reports and attachments, the correspondence set out above between Goldstein, the City, and Judge Del Pesco, and Judge Del Pesco's various orders. In addition, the City called Dixon and O'Donnell as witnesses. Goldstein introduced a few other documents and called Steven Goldstein and Richard May, Esquire, a real estate attorney in Wilmington, as witnesses. During the course of the hearing, the parties introduced most, if not all, of the facts set out above underlying each of Goldstein's transactions.

On December 6, 1994, Judge Del Pesco issued an extensive opinion outlining the facts and explaining her findings that Goldstein had breached the conditions of his probation. With respect to **719 Church,** she found that "the manner and method of disposing of this property subverted not only the letter, but also the spirit of the agreement between the City and [Goldstein]." In particular, she found that when Goldstein's 719 Corp. sold the property, it retained a purchase money mortgage in violation of her July 6, 1992 order and in contradiction to Goldstein's representations to her and the City. She stated that "[t]he purpose of having independent financing was the presumption that no lender would allow the property to be purchased by a person not capable of meeting the financial obligations associated with the purchase." In addition, she noted that the property was purchased by a young man with no income who never made a mortgage payment and reimbursed the Goldsteins for the cost of settlement.

With respect to **707 Washington,** Judge Del Pesco found that Goldstein's Kirklynn Corporation sold the property to Amin despite her statement that she would not amend her July 6, 1992 order barring him from doing so. She noted that she had never signed the stipulation entered into by Goldstein and the City allowing the sale of this property. Furthermore, she found that Kirklynn took back a purchase money mortgage contrary to a letter from Goldstein dated January 22, 1993.

With respect to **1300 West,** Judge Del Pesco found that Steven Goldstein had rescheduled the July 8, 1992 zoning board hearing referred to in her July 6, 1992 order for sometime in September of 1992 without informing her. Moreover, she found that Steven retained a controlling interest in the property through his simultaneous ownership of 40% of the stock of Center Five Corporation and his retention for a substantial period of time of a $52,000 mortgage on the property.

With respect to **1401 W. 6th,** Judge Del Pesco found that the Goldsteins' sale of this property to Jose Valentin violated her July 6, 1992 order requiring them to sell the property to Michael Kazer. In addition, she found that Selma Goldstein's retention of a purchase money mortgage on the property violated her October 23, 1992 order that the Goldsteins not retain any mortgage, lien, or security interest in the property.

With respect to **2701 Washington,** Judge Del Pesco found that the Goldsteins' sale of this property on October 7, 1993 violated her July 6, 1992 order, which imposed a sale deadline of September 15, 1992. In general, Judge Del Pesco found that the Goldsteins had subverted the fundamental purpose of the Agreement, "to require dilapidated buildings to be purchased by persons willing to rehabilitate them and bring them up to Code specifications." She observed that the Kaufmans, through Alexander Southwest, Inc., appeared to have no interest in acquiring these properties or in bringing them to a Sheriff's sale because they are willing simply to hold default judgments against the mortgagees.

### G. *Events Following the December 6, 1994 Opinion*

On December 14, 1994, Judge Del Pesco denied a motion for reargument of her December 6, 1994 opinion. However, she did correct a typographical error pointed out by Goldstein and issue amended pages 6 and 23 of the opinion.

On December 16, 1994, Judge Del Pesco denied Goldstein's motion for certification of reasonable doubt. She stated that she had disposed of all but one of the issues raised in Goldstein's motion—that she ordered the violation of probation hearing and made a decision adverse to Goldstein "based, at least in part, upon improper *ex parte* communication from the Receiver without notice to the parties." In support of this argument, Goldstein referred to the copy of his September 20, 1994 letter that Dixon had marked up and sent by facsimile to Judge Del Pesco. The Judge stated that her communications were not *ex parte* because Dixon was not a party to the proceedings and because he was an arm of the court. In addition, she stated that she did not rely on Dixon's statements in making her decisions. Finally, she observed that Dixon's statements became moot after she interpreted Goldstein's September 20, 1994 letter as a rejection of her offer to settle the case. On that same day, a Delaware Supreme Court Justice refused to issue a certificate of reasonable doubt.

On January 26, 1995, Goldstein was released from the Multi–Purpose Criminal Justice Facility in Wilmington, Delaware, to the Plummer Work Release Center. On February 2, 1995, the Delaware Supreme Court issued an order affirming Judge Del Pesco's December 6, 1994 opinion. *Goldstein v. State*, No. 483, 1994, 1995 WL 48379 (Del. Supr.Ct. Feb. 2, 1995). On March 3, 1995, Goldstein was released from the Plummer Center. On April 13, 1995, Goldstein filed this petition for a writ of habeas corpus.

## II. *DISCUSSION*

Goldstein makes three arguments in support of his contention that Judge Del Pesco's revocation of his probation violated his right to due process. First, Goldstein argues that Judge Del Pesco compromised her neutrality by mingling investigative, accusatory, and adjudicative functions in this case. Second, Goldstein argues that he did not receive adequate notice of the reasons for the revocation of his probation because the grounds stated in Dixon's reports differed from the grounds asserted by Judge Del Pesco in her December 6, 1994 opinion. Third, Goldstein argues that he did not receive proper notice of the conditions of his probation because these conditions were based on unanticipated interpretations of his Agreement with the City.

Goldstein has exhausted state remedies with respect to each of the due process claims raised in his federal habeas corpus petition. *See Smith v. Digmon*, 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978). In addition, Goldstein does not appear to be barred procedurally from raising any of his claims. Therefore, the court may consider the merits of each of Goldstein's claims.

### A. *Was Goldstein Deprived of a Constitutionally Neutral Factfinder?*

■ Respondents argue that Goldstein's first claim is barred by the retroactivity principles of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). However, respondents' *Teague* argument is based on the characterization of Goldstein's claim as creating a new rule preventing a probation officer from stating her opinion regarding sentencing to a judge. Goldstein has subsequently clarified that he seeks merely to apply the long-standing rule that the finder of fact in a probation revocation proceeding must be neutral and detached. *See Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *United States v. Barnhart*, 980 F.2d 219 (1992). Based on Goldstein's clarification, the court finds that he is not seeking the benefit of a "new" rule under *Teague*, and thus his first claim is not barred from federal habeas corpus review.

*Gagnon* requires a neutral and detached fact finder in a revocation of probation proceeding. *Id.* at 786, 93 S.Ct. at 1761–62; *Barnhart*, 980 F.2d at 222. Goldstein argues that Judge Del Pesco was not a constitutionally neutral factfinder when she revoked Goldstein's probation. Specifically, he ar-

gues that it was improper for Judge De Pesco to appoint Dixon as the Receiver and then use him to investigate alleged wrongdoing by Goldstein and advise her as to the proper course of action. Goldstein argues that her "*ex parte* communications" with Dixon gave her "personal knowledge and impression[s]" that Goldstein could not test by adequate cross-examination," quoting *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Goldstein apparently relies on the marked-up letter sent by Dixon to Judge Del Pesco as an example of such "*ex parte* communications." In addition, he argues that Dixon's financial interest in having properties transferred to him under the Agreement raised the "general unseemliness" of Judge Del Pesco's use of Dixon to an "error of constitutional magnitude."

1. *Did Judge Del Pesco have the power to appoint a special investigator with respect to the City's allegations against Goldstein?*

■ No specific rule of the Delaware Superior Court Criminal Rules ("DSCCR") states whether a Superior Court judge can appoint a special investigator to examine allegations that a defendant has violated the conditions of his probation. When no specific procedural rule covers a particular exigency, DSCCR 57(d) gives the Superior Court the ability "to regulate its practice ... in any lawful manner not inconsistent with these rules or with the rules of the Supreme Court." No rule of the Superior Court or the Delaware Supreme Court appears to prevent a Superior Court judge from appointing a special investigator for a revocation of probation proceeding. To the contrary, DSCCR 42 specifically allows a Superior Court judge to appoint a private attorney as a special prosecutor in a criminal contempt proceeding under that rule. *DiSabatino v. Salicete,* 671 A.2d 1344, 1352–53 (Del.Supr.Ct.1996) (citing *Young v. United States ex rel Vuitton,* 481 U.S. 787, 793, 107 S.Ct. 2124, 2130, 95 L.Ed.2d 740 (1987)). Thus, Delaware procedural rules clearly contemplate that a Superior Court judge can appoint a private attorney to perform nonjudicial tasks.

A revocation of probation proceeding is analogous to a criminal contempt proceeding.

Both proceedings require notice to the defendant, and both pose the potential problem of placing the judge simultaneously in an accusatory, investigatory, and adjudicative role. The appointment of a special prosecutor in a criminal contempt proceeding provides notice to the defendant of the basis for the contempt allegation and removes the judge from the accusatory and investigate stages of the proceeding. Similarly, the appointment of a special investigator for a revocation of probation proceeding provides notice to the defendant of the basis for the potential revocation and removes the judge from any accusatory or investigative role. Therefore, it appears not only lawful but wise for a Superior Court judge to appoint a special investigator pursuant to DSCCR 57(d) for a revocation of probation proceeding.

■ The wisdom of appointing a special investigator particularly is apparent in this case. Determining whether Goldstein was violating the conditions of his probation involved examining numerous documents and properties, as well as interpreting the requirements of the Agreement and Judge Del Pesco's various orders. The time, expense, and effort necessary to this investigation would have severely taxed the resources of Judge Del Pesco or of Goldstein's probation officer. Moreover, if Judge Del Pesco had conducted this investigation on her own, she would have been unable to sit as a fact finder in Goldstein's various revocation of probation proceedings. Therefore, it appears that Judge Del Pesco properly appointed a special investigator pursuant to DSCCR 57(d).

2. *Did Judge Del Pesco's communications with Dixon prevent her from remaining a neutral and detached fact finder?*

Goldstein makes two arguments in support of his contention that Judge Del Pesco's communications with Dixon prevented her from remaining a neutral and detached fact finder. First, he argues that Judge Del Pesco's communications with Dixon as the special investigator created a *per se* violation of his due process rights either because she assumed the role of Goldstein's investigator/accuser or because she abdicated her role as judge to Dixon. Second, he argues that even if Judge

Del Pesco's communications with Dixon did not constitute a *per se* violation of his due process rights, Dixon's personal financial interest as the Receiver under the Agreement created a conflict of interest with his role as the special investigator, thereby causing constitutional error.

a. *Did Judge Del Pesco's communications with Dixon as her appointed special investigator create a* per se *violation of Goldstein's due process rights?*

Goldstein argues that Dixon's role as the special investigator was to act as the counselor and alter ego of Judge Del Pesco. Thus, Goldstein argues that Dixon's investigative and accusatory roles became merged with Judge Del Pesco's role as the detached fact finder, thereby compromising Judge Del Pesco's independence and neutrality. Respondents argue that Dixon's role as the special investigator was more analogous to that of a probation officer in a more typical revocation of probation proceeding. Thus, they argue that Judge Del Pesco did not compromise her neutrality by appointing Dixon to investigate and report on Goldstein's compliance with the conditions of his probation.

█ The role of the special investigator in this case seems more analogous to that of a probation officer in a more typical revocation proceeding. A probation officer investigates alleged violations of a defendant's probation and reports his findings to the court for the purpose of sentencing. The probation officer also makes recommendations concerning the appropriate sentence for the court to give. Similarly, as the special investigator in this case, Dixon conducted an independent examination of Goldstein's compliance with the conditions of his probation based on the City's allegations. In addition, he reported his findings to Judge Del Pesco in his First and Second Reports and made recommendations to her concerning the appropriate action that she should take with regard to Goldstein's resentencing.

█ It is not a violation of a defendant's due process rights for a probation officer to make suggested findings of fact and sentencing recommendations in his presentence report. *United States v. Belgard*, 894 F.2d

1092 (9th Cir.1990). The job of the probation officer is to provide "as much information as possible in order to enable the [court] to make an informed decision." *Id.* at 1097–98. Moreover, the probation officer's suggested findings of fact and sentencing recommendations are not binding on the court, nor do they preclude the court from resolving disputed facts and issues. *Id.* at 1099. Finally, the integrity of the judicial role ensures that the court has "the ability to read a presentence report without being improperly influenced." *Id.*

Similarly, it was not a violation of Goldstein's due process rights for Dixon as Judge Del Pesco's special investigator to make suggested findings of fact and recommendations regarding the revocation of Goldstein's probation. Dixon's First and Second Reports provided Judge Del Pesco with the information that she needed to make an informed decision regarding Goldstein's compliance with the conditions of his probation, particularly with respect to the Agreement and her orders. In addition, Dixon's findings and recommendations were not binding on Judge Del Pesco, nor did she indicate in any way that she was abdicating her responsibility to make independent factual and legal conclusions. Moreover, Goldstein had the opportunity to cross-examine Dixon in Judge Del Pesco's presence during the revocation proceedings. Finally, Judge Del Pesco specifically stated in her December 14, 1994 order denying Goldstein's motion for a certificate of reasonable doubt that the marked-up letter from Dixon did not influence her decision to hold the revocation proceeding and eventually revoke Goldstein's probation. Thus, Judge Del Pesco's communications with a special investigator appointed by her do not constitute a *per se* violation of the constitutional requirement that she remain a neutral and detached fact finder.

b. *Did Dixon's personal financial interest as the Receiver create a conflict of interest with his role as the special investigator, thereby violating Goldstein's due process rights?*

In his reply to respondents' answer, Goldstein argues that even if Judge Del Pesco's communications with Dixon did not constitute

a *per se* violation of his due process rights, Dixon's personal financial interest as the Receiver under the Agreement created a conflict of interest with his role as the special investigator, thereby causing constitutional error. Specifically, Goldstein observes that Dixon receives compensation under the Agreement for disposing of properties transferred to him as the Receiver. Goldstein further observes that if he is found in violation of his probation, then his properties will be transferred to Dixon for sale. Based on these facts, Goldstein argues that Dixon had a personal financial interest in finding Goldstein in violation of his probation that conflicted with his neutral role as the special investigator.

To the extent Goldstein is arguing that Dixon's potential conflict of interest compromised Judge Del Pesco's neutrality, the court finds that Goldstein's argument is without merit for the reasons set out above. Specifically, Judge Del Pesco was aware of this potential conflict, Goldstein cross-examined Dixon in her presence, she made independent findings of fact and conclusions of law, and she specifically stated that she did not rely on the marked-up letter from Dixon. In addition, Goldstein agreed that Dixon was the appropriate person to investigate the City's allegations, at least with respect to **719 Church.** Goldstein certainly was aware of Dixon's potential conflict at that time and apparently did not believe that Dixon's potential conflict would interfere with or otherwise compromise Judge Del Pesco's neutrality. Thus, the court will dismiss Goldstein's claim that Judge Del Pesco's appointment of Dixon as a special investigator violated Goldstein's due process right to a neutral and detached fact finder.

■ To the extent Goldstein relies on the Supreme Court's decision in *Young v. United States ex rel Vuitton,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), to argue that Dixon's potential conflict of interest by itself invested the revocation proceeding with error, Goldstein failed to raise this argument before the Delaware Supreme Court. Therefore, Goldstein has failed to exhaust his state remedies with respect to this claim. *See*

*Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978).

### B. *Did Goldstein Receive Adequate Notice of the Reasons for the Revocation of His Probation?*

Goldstein argues that he did not receive adequate notice of the reasons for the revocation of his probation because the grounds stated in Dixon's First and Second Reports differed from those relied upon by Judge Del Pesco in her December 6, 1994 opinion. *Gagnon* requires *written* notice of the claimed violations of probation. *Id.* at 786, 93 S.Ct. at 1761–62; *Barnhart,* 980 F.2d at 222. Goldstein received three written documents to apprise him of the nature of his alleged violations of his probation: the Probation Officer's report, and Dixon's First and Second Reports. However, the Probation Officer's report does not discuss any violations with respect to the properties at issue in this case. Thus, the court must compare the notice provided by Dixon's two reports with Judge Del Pesco's December 6, 1994 opinion.

#### 1. *What notice did Goldstein receive with respect to each property?*

##### a. *719 Church*

■ Dixon's First Report detailed a number of discrepancies with respect to 719 Church. In particular, he discovered that the lender was not Southwest Ventures, Inc, but 719 Corporation ("719 Corp."), a Goldstein corporation. In addition, Dixon stated that the purchase involved a purchase money mortgage. In her opinion, Judge Del Pesco found, among other things, that the purchase money mortgage given by Goldstein's corporation violated her July 6, 1992 order. Thus, Goldstein received adequate written notice of the basis for Judge Del Pesco's finding of a violation with respect to **719 Church.**

##### b. *1300 West*

■ Dixon's Second Report stated that Steven Goldstein's retention of the remaining 40% of Center Five's stock and a $52,000 mortgage on **1300 West** gave him "more than a 50% controlling interest in this property" in violation of the Agreement. In her opinion,

Judge Del Pesco found, among other things, that Steven retained a controlling interest in the property through his simultaneous ownership of 40% of the stock of Center Five Corporation and his retention for a substantial period of time of a mortgage on the property. Thus, Goldstein received adequate written notice of the basis for Judge Del Pesco's finding of a violation with respect to **1300 West.**

### c. *707 Washington*

■ Dixon's Second Report found no violation with respect to **707 Washington.** However, Judge Del Pesco found that Kirklynn Corporation's sale of the property to Timothy Amin violated her July 6, 1992 order. Thus, it appears that Goldstein did not receive adequate written notice of the basis for Judge Del Pesco's finding of a violation with respect to **707 Washington.**

### d. *2701 Washington*

■ Dixon's Second Report stated that Selma Goldstein retained a purchase money mortgage from the sale of **2701 Washington** to Denzil Lamont. However, Judge Del Pesco found that the Goldsteins' sale of this property on October 7, 1993, violated her July 6, 1992 order, which imposed a sale deadline of September 15, 1992. Thus, it appears that Goldstein did not receive adequate written notice of the basis for Judge Del Pesco's finding of a violation with respect to **2701 Washington.**

### e. *1401 W. 6th*

■ Dixon's Second Report stated that Selma Goldstein used a purchase money mortgage to sell **1401 W. 6th.** In her opinion, Judge Del Pesco found, among other things, that Selma's retention of a purchase money mortgage on the property violated her October 23, 1992 order that the Goldsteins not retain any mortgage, lien, or security interest in the property. Thus, Goldstein received adequate written notice of the basis for Judge Del Pesco's finding of a violation with respect to **1401 W. 6th.**

### 2. *Was the partially deficient notice nevertheless harmless error?*

As set out above, the notice provided to Goldstein by Dixon's First and Second Reports was partially deficient. Goldstein did have sufficient written notice of the reasons for the revocation of his probation with respect to **719 Church, 1300 West,** and **1401 W. 6th.** However, he did not have sufficient written notice with respect to **707 Washington** and **2701 Washington.**

■ Respondents did not raise in their answer the issue of whether partially deficient notice constitutes harmless error. While failure to raise the issue of harmless error can constitute a waiver, courts have discretion to overlook such a waiver under certain circumstances. *See Lufkins v. Leapley,* 965 F.2d 1477, 1481–82 (8th Cir.1992); *United States v. Giovannetti,* 928 F.2d 225, 226–27 (7th Cir.1991); *United States v. Pryce,* 938 F.2d 1343, 1348 (D.C.Cir.1991); *see also Jones v. Page,* 76 F.3d 831 (7th Cir.1996) (affirming a district court's *sua sponte* determination that a constitutional violation was harmless error). A court may undertake its own harmless error analysis if the "relevant portions of the record are reasonably short and straightforward," *Pryce,* 938 F.2d at 1348, and if the certainty of the harmlessness finding is clear. *See Giovannetti,* 928 F.2d at 227.

### a. *Are the relevant parts of the record short and straightforward?*

■ While this case has a lengthy and convoluted history, the relevant portions of the record are reasonably short. *See Lufkins,* 965 F.2d at 1482. The relevant conditions of Goldstein's probation are set out in Judge Del Pesco's July 6, 1992 order, which is 3 pages. The relevant violation notices, Dixon's reports, are likewise short. Dixon's First Report is 11 pages, with 45 pages in exhibits attached. Dixon's Second Report is 7 pages, with 26 pages in exhibits attached. Finally, the relevant violation findings are set out in Judge Del Pesco's December 6, 1994 opinion, which is 30 pages.

In addition, all of these documents are straightforward. Judge Del Pesco's July 6,

1992 order clearly identifies Goldstein's obligations pursuant to his probation. Specifically, the order bars the Goldsteins "from taking any further action with regard to **707 Washington Street**," and it allows them to sell **2701 Washington** "so long as the sale is executed by September 15, 1992." Furthermore, Dixon's reports and Judge Del Pesco's opinion discuss each property separately and succinctly state the facts supporting the contentions that Goldstein violated his probation with respect to each separate property.

b. *How certain is a harmlessness finding?*

 The court has found only one case that addresses the issue of whether a partially deficient written notice pursuant to a revocation of probation proceeding constitutes harmless error in the context of a habeas corpus proceeding pursuant to 28 U.S.C. § 2254. In *Kartman v. Parratt*, 535 F.2d 450 (8th Cir.1976), a defendant on probation from a state conviction received notice by an information filed by the state of two violations of his probation. A hearing was held that same day before the Douglas County District Court in Omaha, Nebraska, but the court continued the proceeding. Subsequently, the state amended the information to allege a third violation. After three hearings on four separate days, the Omaha District Court revoked the defendant's probation based on all three grounds alleged by the state. On appeal, the Nebraska Supreme Court affirmed. *Id.* at 453.

The defendant then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Nebraska. The District Court found that the additional third charge was vague and thus did not satisfy the constitutional requirement of written notice. However, the District Court determined, and the Circuit Court of Appeals for the Eighth Circuit affirmed, that the insufficiency of the one allegation "was harmless beyond a reasonable doubt" because the remaining two allegations contained sufficient specificity and because the state had proven these two charges by clear and convincing evidence. *Id.* at 453–54.

Based on the facts and reasoning of *Kartman*, the instant case appears to present a clear instance of harmless error: 1) Goldstein admitted during the hearing that these transactions had taken place, although he contested the finding that the transactions violated his probation; 2) Dixon's Second Report gave Goldstein notice of suspected violations concerning the sales of **2701 Washington** and **707 Washington;** 3) Judge Del Pesco had specifically denied Goldstein's request to modify her July 6, 1992 order to allow the sale of **707 Washington** to Amin; 4) Judge Del Pesco continued the revocation hearing until October 6, 1994, to give Goldstein time to "marshal the facts in his defense and to clarify what the charges are, in fact," *Wolff v. McDonnell,* 418 U.S. 539, 565, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974), and to present evidence to mitigate the significance of his violations, *see Morrissey v. Brewer,* 408 U.S. 471, 488, 92 S.Ct. 2593, 2603–04, 33 L.Ed.2d 484 (1972); 5) this court has found that Goldstein did have sufficient written notice with respect to **719 Church, 1300 West,** and **1401 W. 6th,** and Goldstein has not challenged the adequacy of the evidence against him concerning those properties; 6) this court independently has reviewed the record of the Superior Court proceedings and agrees with Judge Del Pesco that Goldstein's violations with respect to these three properties were established by clear and convincing evidence; and 7) Goldstein failed to object during the hearing to the inquiry into these additional violations.

For the reasons set out above, the court finds beyond a reasonable doubt that Goldstein's partially inadequate notice constituted harmless error. Thus, the court will raise the issue of harmless error *sua sponte* and dismiss Goldstein's claim that he received inadequate notice of the grounds for revocation.

C. *Did Goldstein Receive Proper Notice of the Conditions of his Probation?*

Goldstein's final argument is that he did not receive proper notice of the conditions of his probation. First, he argues that some of these conditions were based on unanticipated interpretations of his Agreement with the City and of Judge Del Pesco's various orders.

Second, he argues that he was not given adequate notice that he would be responsible for the actions of members of his family. Third, he argues that he could not anticipate that actions he or his family took with the knowledge and acquiescence of Judge Del Pesco and the City could later be deemed violations of his probation. Fourth, he argues the Judge Del Pesco based some of her findings on an unanticipated construction of property law.

As a general matter, the court notes that Goldstein's claims of prejudice based on his failure to understand the conditions of his probation appear to have little basis in fact. Under the Agreement, the Goldsteins were to have sold, demolished, or rehabilitated all properties that they owned or controlled by May 18, 1992. It is undisputed that the Goldsteins failed to do this. Judge Del Pesco granted Goldstein an additional 27 months to accomplish these tasks, and the record demonstrates that Goldstein attended numerous hearings, office conferences, and teleconferences and received numerous letters, reports, and orders detailing the conditions of his probation. During that entire time, Goldstein never raised any of the objections that he now raises regarding the sufficiency of notice of the conditions of his probation. Nevertheless, the court will examine each of Goldstein's claims on the merits.

1. *Were the conditions of Goldstein's probation based on unanticipated interpretations of the Agreement or Judge Del Pesco's orders?*

Goldstein argues that he could not reasonably foresee Judge Del Pesco's interpretation of the Agreement as requiring Goldstein's properties to be purchased by persons willing and able to rehabilitate them. Goldstein also argues that he could not anticipate Judge Del Pesco's requirement, based on that interpretation, that the buyer of **719 Church** must have independent commercial financing, and that a purchase money mortgage is not independent financing. In addition, he argues that he could not reasonably foresee that selling **1401 W. 6th** by means of a purchase money mortgage would violate Judge Del Pesco's order preventing the Goldstein's from "retaining" a mortgage.

■ At the June 26, 1992 hearing, Judge Del Pesco specifically told Goldstein with respect to the sale of **719 Church:** "However, I don't want any purchase money mortgages. When I see a purchase mortgage with a three hundred dollar down payment and the balance a purchase money mortgage, that does not make me a very happy person. That is a sham." In addition, Judge Del Pesco's July 6, 1992 order states that Goldstein must present a signed purchase contract "without a purchase money mortgage." Nevertheless, Goldstein executed a purchase money mortgage when he sold this property to Nelson Brockenborough and then represented to Judge Del Pesco at the October 30, 1992 violation hearing that the sale involved "independent financing." Goldstein clearly was on notice that a purchase money mortgage was inappropriate with respect to the sale of **719 Church.** Moreover, Brockenborough's complete failure to make mortgage payments on the property and the Goldsteins involvement in the lawsuits to recover the payments and the settlement costs doubtless convinced Judge Del Pesco that the sale of **719 Church** was in fact a sham. Thus, Goldstein was on notice that the sale of **719 Church** was not to include a purchase money mortgage.

■ With respect to **1401 W. 6th,** Judge Del Pesco's October 23, 1992 order specifically stated: "Louis Goldstein, his family and agents may *retain* no legal or equitable interest, including any mortgage, lien, or other security interest in the propert[y] at 1401 W. 6th Street ..." (emphasis added). Goldstein cites the dictionary definition of "retain" as to "keep possession of" or "to continue to hold or have" and argues that Selma did not "retain" the mortgage because she subsequently assigned to Southwest Ventures, Inc. for $1. Goldstein apparently implies that "retain" must mean "retain indefinitely" or "retain for some specific amount of time." Accepting Goldstein's quoted definition of "retain," Selma clearly "kept possession of" or "continued to hold or have" the mortgage on **1401 W. 6th** when she sold the property to Jose Valentin. Selma's "retention" of the mortgage was clearly a violation of the order, if only a technical one. Moreover, by assign-

ing the mortgage for $1, she arguably "retained" an equitable interest in the property, which the order also forbids. Thus, Judge Del Pesco's interpretation of "retain" was not unforeseeable or unusual, and Goldstein was sufficiently on notice that Selma should retain any mortgage or interest in **1401 W. 6th.**

### 2. Did Goldstein have adequate notice that he would be responsible for the actions of his family members?

Goldstein argues that he could not reasonably foresee that he would be held responsible for Steven's actions. Goldstein argues that the only control he had over his son Steven was through the Power of Attorney executed by Steven in favor of Goldstein, and thus could not control Steven's activities with respect to **1300 West** and **719 Church,**

■ The Agreement specifically covers "Louis Goldstein ... and members of his immediate family, (i.e. his wife and children) associated corporations (i.e. corporations of which the previous persons own a 50% of greater interest)...." In addition, the Agreement requires that "all 'vacant properties' owned or controlled by the Goldsteins will be sold, demolished or rehabilitated...." Thus, Goldstein clearly was on notice that he would be held responsible for any actions taken by Selma or Steven with respect to the properties covered by the Agreement. The requirement that Steven execute of Power of Attorney in favor of Goldstein merely emphasizes that if Steven failed to comply with the terms of the Agreement with respect to properties owned by him, Goldstein had the responsibility to turn Steven's properties over to the Receiver. Thus, Goldstein's argument is without merit.

### 3. Were any actions taken by Goldstein or his family with the acquiescence of Judge Del Pesco and the City later deemed violations of his probation?

Goldstein argues that he could not reasonably foresee that the sale of **707 Washington** to Timothy Amin would be a violation. He asserts that the City stipulated to the sale, that counsel advised him it was permitted, and that Judge Del Pesco was aware· of the stipulation. In addition, Goldstein argues

that he could not reasonably foresee that failing to sell **2701 Washington** by the September 15, 1992 deadline would continue to be a violation of probation after the City and Judge Del Pesco knew before the first violation of probation hearing in October of 1992 that the property had not been sold by that deadline.

■ Judge Del Pesco's July 6, 1992 order specifically stated: "Louis Goldstein, his family and agents are barred from taking any further action with regard to **707 Washington Street.**" She was aware of the stipulation regarding the sale of **707 Washington.** However, in response to Goldstein's request, she specifically declined to amend her order to allow a sale to Amin. Thus, Goldstein certainly was on notice that he could not sell **707 Washington.**

■ With respect to **2701 Washington,** Judge Del Pesco's July 6, 1992 order permitted Goldstein to sell that property only if the sale was executed by September 15, 1992. Goldstein's violation of this order was not his failure to sell the property by that deadline, as he asserts, but his sale of the property on October 7, 1993, after the deadline. Goldstein clearly was on notice that he could not sell **2701 Washington** after September 15, 1992.

### 4. Did Judge Del Pesco base some of her findings on an unanticipated construction of property law?

Goldstein argues that he could not reasonably foresee that the court would add Steven's 40% ownership of the stock of Center Five Corp. to his mortgage to conclude that Steven had a "controlling interest" in **1300 West.** Goldstein argues that under Delaware law, a mortgage is not an interest in property but rather a "high security" for debt, citing 2 *Woolley on Delaware Practice,* § 1353 and *Metropolitan Life Insurance Co. v. Monroe Park,* 442 A.2d 503, 509 (Del.Super.1982), *rev'd on other grounds,* 457 A.2d 734 (1983). Goldstein then cites *Douglas v. Buder,* 412 U.S. 430, 432, 93 S.Ct. 2199, 2200–01, 37 L.Ed.2d 52 (1973), for the proposition that a court cannot find a violation of

probation based on a unique or unanticipated construction of the law.

 The Agreement required the Goldsteins to sell, demolish, or rehabilitate all properties that they "owned" or "controlled" by May 18, 1992. While it is true that under Delaware law a mortgage is not an interest in property, Judge Del Pesco did not hold that Steven's mortgage was a legal interest in **1300 West**. Rather, she observed that Selma's execution of a mortgage on the property in favor of Steven only 6 minutes before selling Michael Kazer 60% of the stock of Center Five Corp. raised serious factual questions as to who "controlled" **1300 West** as that term is used in the Agreement. As a result of these transactions, she found that Steven did have "control" of **1300 West** for a substantial period of time after the May 18, 1992 deadline in the Agreement. Judge Del Pesco's factual finding is presumed correct under 28 U.S.C. § 2254(d) absent a specific statutory exception. *See Sumner v. Mata,* 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982). Judge Del Pesco was not interpreting property or mortgage law at all, and thus *Douglas* is inapposite. Goldstein clearly was aware that he was not to control **1300 West** after the May 18, 1992 deadline.

Based on the above, Goldstein had sufficient notice of the conditions of his probation. Moreover, Goldstein failed to object to these conditions until over two years after he became aware of these conditions. Therefore, his due process rights were not violated, and the court will dismiss this claim.

### III. *CONCLUSION*

For the reasons set out above, all three of Goldstein's due process claims are without merit. Consequently, the court will deny Goldstein's petition for a writ of habeas corpus and dismiss this case.

The court will issue an Order in accordance with this Memorandum Opinion.